Adam Pollock
POLLOCK COHEN LLP
111 Broadway, Suite 1804
New York, NY 10006
(212) 337-5361

Ben Barnow*
Anthony L. Parkhill*
BARNOW AND ASSOCIATES, P.C.
205 West Randolph Street, Ste. 1630
Chicago, IL 60606
Tel: (312) 621-2000

*pro hac vice forthcoming

*Attorneys for Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANGELA HALEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LEGACY TREATMENT SERVICES, INC. and COMMUNITY TREATMENT SOLUTIONS, INC.,<br><br>Defendants. | Case No. 25-14968<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

# CLASS ACTION COMPLAINT

Plaintiff Angela Haley ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendants Legacy Treatment Services, Inc. ("Legacy") and Community Treatment Solutions, Inc. ("CTS" and with Legacy, "Defendants"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## INTRODUCTION

1. Plaintiff brings this class action against Defendants for their failure to secure and safeguard approximately 41,826 individuals', including Plaintiff's, personally identifying information ("PII") and personal health information ("PHI"), including names, Social Security numbers, dates of birth, driver's license numbers/state ID numbers, phone numbers, email addresses, passport numbers, financial account numbers, routing numbers, bank names, credit/debit card numbers, card CVVs, expiration dates, PIN/security codes, login information, medical diagnoses, clinical information, medical treatment/procedure information, treatment types, treatment locations, treatment cost information, doctors' names, medical record numbers, patient account numbers, health insurance information, prescription information, and biometric data.

2. Legacy is a behavioral health organization headquartered in Marlton, New Jersey. CTS is a youth social services organization headquartered in Marlton, New Jersey.

3. Between October 6, 2024 and October 11, 2024, an unauthorized third party gained access to Defendants' network systems and acquired files containing the PII/PHI of Defendants' patients and employees, including Plaintiff and Class members (the "Data Breach").

4. Defendants owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendants breached that duty by, among other things, failing to implement and maintain reasonable security

procedures and practices to protect their patients' and employees' PII/PHI from unauthorized access and disclosure.

5. As a result of Defendants' inadequate security and breach of their duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach.

6. Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, and unjust enrichment, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Angela Haley***

7. Plaintiff is a citizen and resident of New Jersey.

8. Plaintiff is an employee of Legacy. As a condition of providing employment to Plaintiff, Legacy required Plaintiff to provide it with her PII/PHI.

9. Based on representations made by Legacy, Plaintiff believed that Legacy had implemented and maintained reasonable security procedures and practices to protect her PII/PHI. With this belief in mind, Plaintiff provided her PII/PHI to Legacy in exchange for receiving employment from Legacy.

10. At all relevant times, Legacy stored and maintained Plaintiff's PII/PHI, which was accessed in the Data Breach.

11. Plaintiff received a letter from Legacy notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12. Since the Data Breach occurred, Plaintiff has experienced an increase in spam calls, texts, and emails. These spam communications include calls from someone pretending to be a "director" at Legacy who tries to get her to buy gift cards. The unknown person knows private information about her and the names of her co-workers.

13. In or about July of 2025, Plaintiff experienced a fraudulent charge of approximately $70 on her debit card. Plaintiff has had to spend time dealing with the fraudulent charge and is still in the process of getting the charge refunded.

14. In addition to the time Plaintiff has had to spend dealing with the fraudulent charge, Plaintiff has spent time changing the passwords on her accounts to protect herself from additional fraud or identity theft in the future.

15. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

***Defendant Legacy Treatment Services, Inc.***

16. Defendant Legacy Treatment Services, Inc. is a New Jersey nonprofit corporation with its principal place of business located at 1 East Stow Road, Marlton, NJ 08053.

***Defendant Community Treatment Solutions, Inc.***

17. Defendant Community Treatment Solutions, Inc. is a nonprofit corporation with its principal place of business located at 1 East Stow Road, Marlton, NJ 08053.

## JURISDICTION AND VENUE

18. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

19. This Court has general personal jurisdiction over Legacy because it is organized under the laws of this State and maintains its principal place of business in this District. This Court has general personal jurisdiction over CTS because it is organized under the laws of this State and maintains its principal place of business in this District.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants' principal places of business are in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of Defendants*

21. Legacy is a behavioral health organization that provides "a complement of services for most ages and needs. This continuum of care provides children, adults and families with consistency in care management and aftercare.[1] CTS is a youth social

[1] *About Us*, LEGACY TREATMENT, https://www.legacytreatment.org/about-us/ (last accessed Aug. 27, 2025).

services organization that "specializes in working with youth who are at risk for out of community placement."[2] CTS is a subsidiary of Legacy and Legacy is CTS's sole member.

22. In the regular course of its business, Defendants collect and maintain the PII/PHI of their patients and employees, including Plaintiff and Class members. Defendants require patients and employees to provide them with their PII/PHI, including the PII/PHI stolen in the Data Breach, before Defendants provide them services or employment.

23. Defendants' website contains a HIPAA Notice of Privacy Practices ("Privacy Notice") that describes how Defendants may use and disclose their patient's PII/PHI.[3]

24. In the Privacy Notice, Defendants state they will obtain patients' written consent before disclosing PII/PHI in ways not described in the Privacy Notice.[4]

25. Defendants promise they are "committed to protecting your medical information."[5] Defendants further admit they are "required by law" to "maintain the privacy of your medical information" and are required to follow the terms of the Privacy Notice.[6]

26. Plaintiff and Class members entrusted Defendants with their PII/PHI in exchange for receiving services or employment.

---

[2] *Community Treatment Solutions*, LEGACY TREATMENT, https://www.legacytreatment.org/services/community-treatment-solutions-cts/ (last accessed Aug. 27, 2025).

[3] *HIPAA Notice of Privacy Practices*, LEGACY TREATMENT, https://legacytxserv.wpenginepowered.com/wp-content/uploads/2019/02/HIPAA-Notice-of-Privacy-Practices-Updated-11-1-18.pdf (last accessed Aug. 27, 2025).

[4] *Id.*

[5] *Id.*

[6] *Id.*

### *The Data Breach*

27. Between approximately October 6, 2024 and October 11, 2024, an unauthorized third party gained access to Defendants' network systems and accessed and acquired the PII/PHI of Defendants' patients and employees, including their names, Social Security numbers, dates of birth, driver's license numbers/state ID numbers, phone numbers, email addresses, passport numbers, financial account numbers, routing numbers, bank names, credit/debit card numbers, card CVVs, expiration dates, PIN/security codes, login information, medical diagnoses, clinical information, medical treatment/procedure information, treatment types, treatment locations, treatment cost information, doctors' names, medical record numbers, patient account numbers, health insurance information, prescription information, and biometric data.[7]

28. Following an investigation, on or about July 18, 2025, Defendants learned that "personal information, including Protected Health Information was accessed and acquired by an unauthorized party."[8]

29. Despite the fact that the Data Breach occurred between approximately October 6, 2024 and October 11, 2024, and Defendants learned that PII/PHI was affected in the Data Breach on or about July 18, 2025, Defendants waited until approximately August 22, 2025—over 10 months after the Data Breach began and more than a month after Defendants learned PII/PHI was impacted—to begin notifying Plaintiff and Class

[7] *Notice of Data Security Incident*, LEGACY TREATMENT (Aug. 22, 2025), https://www.legacytreatment.org/home/notice-of-data-security-incident/.
[8] *Id.*

members that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[9]

30. Defendants acknowledge that the Data Breach places Plaintiff and Class members in imminent danger of fraud and identity theft. The data breach notice on Defendants' website warns Plaintiff and Class members they should review their account statements and credit reports and place credit freezes on their credit files.[10]

31. Defendants' failure to promptly notify Plaintiff and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendants Knew that Criminals Target PII/PHI***

32. At all relevant times, Defendants knew, or should have known, that the PII/PHI that they collected, shared, and stored was a target for malicious actors. Despite such knowledge, Defendants failed to, or shared PII/PHI with third parties that failed to, implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that they should have anticipated and guarded against.

---

[9] *See id.*
[10] *Id.*

33. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[11]

34. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[12] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[13]

35. PII/PHI is a valuable property right.[14] The value of PII/PHI as a commodity is measurable.[15] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[16] American companies are estimated to have

---

[11] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.
[12] Denyl Green, *Data Breach Outlook*, KROLL (Feb. 18, 2025), https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025.
[13] *See id*.
[14] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.
[15] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.
[16] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

spent over $19 billion on acquiring personal data of consumers in 2018.[17] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

36. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

37. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[18] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[19]

38. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[20] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals

[17] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[18] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[19] *Id.*

[20] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[21]

39. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[22] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[23]

40. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[24]

41. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[21] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[22] Steager, *supra* note 18.

[23] *Id.*

[24] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

42. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[25] [26]

43. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[27]

44. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[28]

---

[25] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Aug. 27, 2025).

[26] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[27] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[28] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Aug. 27, 2025).

45. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[29] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[30] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[31] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[32]

46. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

> a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.
>
> b. Significant bills for medical goods and services neither sought nor received.
>
> c. Issues with insurance, co-pays, and insurance caps.
>
> d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

---

[29] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.
[30] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 21.
[31] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Aug. 27, 2025).
[32] *Id.*

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[33]

47. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[34]

48. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

[33] *See* Dixon & Emerson, *supra* note 29.

[34] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

### *Damages Sustained by Plaintiff and Class Members*

49. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

50. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

51. Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

52. Excluded from the Class are Legacy Treatment Services, Inc. and its affiliates, parents, subsidiaries, officers, agents, and directors; Community Treatment Solutions, Inc. and its affiliates, parents, subsidiaries, officers, agents, and directors; as well as the judge(s) presiding over this matter and the clerks of said judge.

53. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

54. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. Legacy reported to the Office of the Maine Attorney General that the Data Breach affected approximately 41,826 persons.[35]

55. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. whether Defendants had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c. whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d. whether Defendants breached those duties to protect Plaintiff's and Class members' PII/PHI; and

e. whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

56. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members.

---

[35] *Search Data Breaches*, OR. DEP'T JUSTICE (Aug. 4, 2025), https://justice.oregon.gov/consumer/DataBreach/.

Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

57. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

58. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

59. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress from Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

60. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

61. Defendants owed a duty to Plaintiff and all other Class members to exercise reasonable care in safeguarding and protecting their PII/PHI in their possession, custody, or control.

62. Defendants knew, or should have known, the risks of collecting and storing Plaintiff's and Class members' PII/PHI, and the importance of maintaining secure systems. Defendants knew, or should have known, of the many data breaches that targeted organizations storing PII/PHI in recent years.

63. Given the nature of Defendants' businesses, the sensitivity and value of the PII/PHI they collect, share, and maintain, and the resources at their disposal, Defendants should have identified the vulnerabilities in their systems and prevented the Data Breach from occurring.

64. Defendants breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to

safeguard and protect PII/PHI entrusted to them—including Plaintiff's and Class members' PII/PHI.

65. It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to, or contracting with companies that failed to, design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

66. Additionally, Defendants had an obligation to provide prompt and accurate notice of the Data Breach to Plaintiff and Class members. Defendants knew that the PII/PHI accessed by cybercriminals in the Data Breach was highly sensitive and can be used to commit identity theft and fraud using Plaintiff's and Class members' PII/PHI, which would cause substantial harm to Plaintiff and Class members.

67. But for Defendants' negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

68. As a result of Defendants' above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and all other Class members have suffered, and will continue to suffer, economic damages and other injury and actual harm in the form of, *inter alia*: (i) a

substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

69. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

70. Defendants' duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

71. Defendants' duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such

as Defendants, of failing to employ reasonable measures to protect and secure PII/PHI.

72. Defendants violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and all other Class members' PII/PHI, not providing notice to Plaintiff and Class members within 60 days of the Data Breach, and not complying with applicable industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII/PHI they obtain and store, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

73. Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

74. Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

75. The harm occurring as a result of the Data Breach is the type of harm HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

76. It was, or should have been, reasonably foreseeable to Defendants that their failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in

the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

77. It was, or should have been, reasonably foreseeable to Defendants that their failure to provide notice to Plaintiff and Class members that their PII/PHI had been accessed by unauthorized individuals within 60 days of the Data breach, would result in harm to Plaintiff and Class members.

78. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Defendants' violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of, or imminent threat of, identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendants' possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF IMPLIED CONTRACT

79. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80. In connection with receiving services or employment, Plaintiff and all other Class members entered into implied contracts with Defendants.

81. Pursuant to these implied contracts, Plaintiff and Class members paid money to Defendants, directly or through their insurance, provided Defendants with their PII/PHI. In exchange, Defendants agreed to, among other things, and Plaintiff and Class members understood that Defendants would: (1) provide services or employment to Plaintiff and Class members; (2) collect, maintain, and utilize Plaintiff's and Class members' PII/PHI to, among other things, facilitate treatment, the provision of services, or employment to Plaintiff and Class members; (3) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; (4) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations, industry standards, and Defendants' representations; and (5) maintain the confidentiality of Plaintiff's and Class members' PII/PHI and protect it from unauthorized access, disclosure, theft, and misuse.

82. The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Defendants, on the other hand. Indeed, as set forth *supra*, Defendants recognized the importance of data security and the privacy of their patients' PII/PHI in its Privacy Notice. Had Plaintiff and Class members known that Defendants would not adequately protect their patients' and employees' PII/PHI, including by failing to have adequate security measures in place, they would not have agreed to provide Defendants with their PII/PHI or received services or employment from Defendants.

83. Plaintiff and Class members performed their obligations under the implied contract when they provided Defendants with their PII/PHI and paid—directly or through their insurers—for services from or provided labor for Defendants.

84. Defendants breached their obligations under their implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and Defendants' representations.

85. Defendants' breach of their obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

86. Plaintiff and all other Class members were damaged by Defendants' breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue

to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT IV**
**UNJUST ENRICHMENT**

87. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88. This claim is pleaded in the alternative to the breach of implied contract claim.

89. Plaintiff and Class members conferred a monetary benefit upon Defendants in the form of monies paid to Defendants for services, benefits derived from labor provided to Defendants, or through the provision of their PII/PHI. Plaintiff did so with an implicit understanding that Defendants would use some of these payments or profits from their labor to protect the PII/PHI they collect, store, and use to provide health care.

90. Defendants accepted or had knowledge of the benefits conferred upon them by Plaintiff and Class members. Defendants also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate their business operations and billing services.

91. As a result of Defendants' conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures that they paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

92. Defendants should not be permitted to retain the money belonging to Plaintiff and Class members because Defendants failed to adequately implement the

data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

93. Plaintiff and Class members have no adequate remedy at law.

94. Defendants should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by them as a result of the conduct and Data Breach alleged herein.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

A. certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. awarding Plaintiff and the Class such other favorable relief as allowable under law.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: August 27, 2025

Respectfully submitted,

/s/ *Adam Pollock*
Adam Pollock
Attorney ID # 046202006
**POLLOCK COHEN LLP**
111 Broadway, Suite 1804
New York, NY 10006
Tel: 212.337.5361
adam@pollockcohen.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*

**Pro hac vice* forthcoming